**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
_____

|  |  |
|---|---|
| **UNITED STATES** ) | |
| **SECURITIES AND EXCHANGE COMMISSION,** ) | |
| ) | **Civil Action No. 07-CV-8851** |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **(ECF CASE)** |
| ) | |
| **NORTEL NETWORKS CORPORATION and** ) | **COMPLAINT** |
| **NORTEL NETWORKS LIMITED,** ) | **SECURITIES FRAUD** |
| ) | |
| **Defendants.** ) | |

_____

The United States Securities and Exchange Commission (the "Commission") alleges that:

## SUMMARY

1.        Nortel Networks Corporation ("Nortel" or "the Company") engaged in two fraudulent accounting schemes, one involving revenue fraud and the other involving earnings management fraud, which enabled Nortel to meet the unrealistic revenue and earnings guidance that it had provided to Wall Street in 2000 and again in 2002 and 2003.  The first scheme accelerated material amounts of revenues into 2000 and created the false appearance that Nortel was weathering an economic downturn better than its competitors.  The second scheme reduced or increased Nortel's earnings as necessary to create the false appearance that Nortel had stabilized its operations and returned to profitability.

2.        In the late 1990s, the United States economy experienced substantial and rapid growth in the telecommunications and internet sectors.  In 2000, however, those sectors contracted significantly.  Demand for such products waned.  Access to capital was severely constricted.

3.      By September 2000, Nortel's revenues began to slip from internal projections by hundreds of millions of dollars. Orders softened. Anticipated revenues from many customers failed to materialize. By mid-October 2000, the Company estimated that revenues for 2000 would fall short of projections by almost $2 billion. A similar shortfall appeared likely for the first half of 2001. Nortel's competitors and its customers were similarly affected by this dramatic slowdown. Despite knowledge of the foregoing, Nortel continued to claim that it would experience substantial growth for the remainder of 2000 and into 2001.

4.      Starting no later than October 2000, Nortel responded to market pressures by engaging in a fraudulent accounting scheme in which it (i) primed Wall Street's expectations by issuing unrealistic financial guidance and (ii) then used accounting adjustments that did not comport with U.S. Generally Accepted Accounting Principles ("US GAAP"), to move its revenues and earnings upward or downward as necessary to meet Wall Street's unrealistic expectations.

5.      The fraud took two forms:

6.      In November of 2000, Nortel altered its revenue recognition policies to accelerate into 2000 revenues (particularly revenues of its optical internet business) as needed to meet its quarterly and annual revenue guidance, and to hide the worsening condition of its business. Bill and hold transactions were at the center of the scheme. US GAAP permits a company to recognize revenues prior to the delivery of a product if the transaction meets certain specific criteria. In the second quarter of 2000, Nortel banned the use of bill and hold transactions company-wide, but, after its revenues fell significantly short of expectations in the third quarter of 2000, it reintroduced bill and hold transactions into its sales and accounting practices. The change principally affected the reporting of revenues on Nortel's optical business – a metric closely watched by Wall Street. It enabled Nortel to recognize revenues on idle, undelivered

inventory sitting in its warehouses and offsite storage locations. The transactions did not satisfy US GAAP requirements but Nortel nonetheless recognized revenues as if they did. In all, Nortel accelerated more than $1 billion in revenues into 2000 through improper bill and hold transactions. In doing so, the Company increased optical (and other) revenues, and reported fourth quarter and fiscal year 2000 results in line with Wall Street's expectations. Nowhere was the existence or effect of this accounting scheme disclosed.

7.      In February 2001, Nortel finally lowered its guidance to account for the fact that its business was suffering from the same widespread economic downturn that was impacting the entire telecommunications industry. Its business plummeted throughout the remainder of 2001 and it suffered serious losses. Nortel reacted by implementing a restructuring plan that reduced its workforce by two-thirds and that resulted in a significant write-down of its assets.

8.      In the summer of 2002, as its business began to emerge from the downturn, Nortel publicly announced that it expected to return to profitability by the second quarter of 2003. Beginning in the fourth quarter of 2002, Nortel embarked on a second scheme – the manipulation of its reserves – to manage its publicly-reported earnings, create a false return to profitability, and pay millions of dollars in bonuses, primarily to its then top executives.

9.      From at least July 2002 through June 2003, Nortel improperly established, maintained and released excess reserves. When it internally (and unexpectedly) determined that it would return to profitability in the fourth quarter of 2002 – sooner than it had broadcast to the investment community – it quickly established and maintained unnecessary reserves in order to reduce earnings for the quarter, avoid reporting a profit earlier than publicly predicted, and add to its existing stockpile of excess reserves that could be (and were) released in the future as necessary to improve its financial results.

10.     When fiscal year 2003 turned out to be rockier than expected, Nortel improperly released sufficient excess reserves to cause it to report a profit in the first quarter of 2003, a quarter earlier than the public expected, and to pay substantial bonuses.  Nortel planned to release excess reserves to achieve profitability in the second quarter of 2003 as well, but, ultimately, it was unable to make all of the reserve releases it had planned.  Nevertheless, because a portion of the planned releases were made, Nortel still reported nearly break-even results (though not an actual profit) and it reached profitability on a *pro forma* basis, which triggered the payment of more bonuses.

11.     In the second and third quarters of 2003, Nortel's outside auditor cautioned Nortel's senior executives and the Audit Committee of Nortel's Board of Directors ("Audit Committee") about the Company's handling of reserves, and the Company's earnings management scheme began to unravel.  Nortel's then senior executives responded to the outside auditor's concerns by conducting a purportedly "comprehensive review" of Nortel's assets and liabilities.  This resulted in an announcement on October 23, 2003, that Nortel would restate its financials for fiscal years 2000, 2001 and 2002.

12.     On November 19, 2003, Nortel filed its quarterly report on Form 10-Q for the period ending September 30, 2003, in which it restated approximately $948 million in total liabilities (the "First Restatement").  In December 2003, the Company amended its 2002 Form 10-K and its Forms 10-Q for the first and second quarters of 2003.

13.     Nortel's First Restatement was a cover-up.  The supposedly "comprehensive review" conducted by Nortel's then senior executives consisted of a superficial and sharply limited review of reserve releases.  The review – and thus the First Restatement – did not in any way address the revenue recognition fraud that the Company had engaged in for the fourth quarter of 2000.  Moreover, because of the restricted focus of the review, the First Restatement

also did not capture a significant number of the improper reserve setups and releases that the Company had orchestrated in the fourth quarter of 2002 and the first and second quarters of 2003. This, in turn, concealed any pattern of fraud in the liabilities Nortel restated. Nortel continued to mislead the public by claiming that the First Restatement was simply a result of accounting errors that had been made during a volatile period when demand for Nortel's products dropped and the Company underwent a restructuring.

14.    Shortly after Nortel announced on October 23, 2003 that it needed to restate its financial statements, Nortel's Audit Committee commenced an independent investigation and hired outside counsel to help it "gain a full understanding of the events that caused significant excess liabilities to be maintained on the balance sheet that needed to be restated," as well as to recommend any necessary remedial measures. The investigation uncovered evidence that Nortel had improperly used its reserves in the second half of 2002 and first half of 2003.

15.    In March 2004, Nortel announced that it would "likely" need to further revise and restate previously filed financial results. In April 2004, it announced it would restate its results a second time and expected to cut its 2003 earnings by half.

16.    In April 2004, the following senior executives were terminated for cause: Frank A. Dunn ("Dunn") (who was Chief Financial Officer ("CFO") during the first scheme and then President and Chief Executive Officer ("CEO")), Douglas C. Beatty ("Beatty") (who was Controller during the first scheme and then CFO) and Michael J. Gollogly ("Gollogly") (who was Controller during the second scheme). Another seven senior finance employees were terminated for cause in August 2004. MaryAnne Pahapill ("Pahapill") (who was Assistant Controller during the first scheme and subsequently Controller) resigned in or about February 2005. Nortel has operated under completely new senior leadership since then.

17.     On January 11, 2005, Nortel issued a "Second Restatement." The Second Restatement restated approximately $3.4 billion in misstated revenues and at least another $746 million in liabilities for fiscal years 2001 and 2002 and the first, second and third quarters of 2003. The financial statement effects of Nortel's two accounting fraud schemes were corrected as of this date, although unresolved material weaknesses in Nortel's internal controls remained.

18.     As a result of the foregoing conduct, Nortel issued materially false and misleading quarterly and annual financial statements and disclosures for at least the financial reporting periods ending December 31, 2000 through December 31, 2003, and in all filings made with the Commission that incorporated those financial statements and related disclosures by reference, including registration statements.

19.     Nortel Networks Limited ("NNL") is Nortel's principal operating subsidiary and, at all relevant times, NNL and Nortel shared the same management slate, including CEO, CFO, Controller and Assistant Controller. NNL's financial results are consolidated into Nortel's publicly reported financial statements. NNL also files periodic reports with the Commission containing its own financial statements. The conduct alleged in the Complaint resulted in NNL materially contributing to Nortel's misleading financial statements and caused NNL's own quarterly and annual financial statements and disclosures to be materially false and misleading for at least the periods ending December 31, 2000 through December 31, 2003, and in all filings made with the Commission that incorporated those financial statements and related disclosures by reference, including registration statements.

20.     By engaging in such conduct, Nortel and NNL violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B) and 13(b)(5) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§

78j(b), 78m(a), 78m(b)(2)(A), 78m(b)(2)(B) and 78m(b)(5)] and Exchange Act Rules 10b-5,

12b20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1 and 240.13a-13].

21.    Unless enjoined, Nortel and NNL are likely to commit such violations in the

future.  They should be permanently enjoined from doing so, ordered to disgorge gains from

their conduct violating the federal securities laws, with prejudgment interest, and ordered to pay

an appropriate civil money penalty.

## JURISDICTION AND VENUE

22.    The Commission brings this action pursuant to Securities Act Section 20(b) [15

U.S.C. § 77t(b)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

23.    This Court has jurisdiction over this action under Securities Act Sections 20(b) and

22(a) [15 U.S.C. §§ 77t(b) and 77v(a)] and Exchange Act Sections 21(d) and 27 [15 U.S.C. §§

78u(d) and 78aa].

24.    Venue is proper pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and

Exchange Act Section 27 [15 U.S.C. § 78aa].  Certain of the acts, practices and courses of conduct

alleged herein, which constitute violations of the Securities Act and Exchange Act, occurred within

the Southern District of New York, including, but not limited to, transactions in Nortel's common

stock which were executed through the facilities of the New York Stock Exchange.

25.    Nortel, directly or indirectly, made use of the means and instrumentalities of

interstate commerce, of the mails, or of the facilities of a national securities exchange in connection

with the acts, practices and courses of conduct alleged herein.

## THE DEFENDANTS

26.    **Nortel Networks Corp. ( "Nortel" or "the Company")** is a Canadian

corporation, with principle executive offices in Toronto, Ontario, Canada.  Nortel's business

consists of the design, development, assembly, marketing, sale, licensing, installation, servicing

and support for networking solutions.  Nortel's common stock is registered with the Commission pursuant to Exchange Act Section 12(b) and trades publicly on the New York and Toronto Stock Exchanges under the symbol "NT."  Nortel also has periodically issued debt securities in the United States that trade on the New York Stock Exchange.

27.    **Nortel Networks Ltd. ("NNL")** is a Canadian corporation located in Toronto, Ontario, Canada.  It has been the principal operating subsidiary of Nortel since May 1, 2000 and, at all relevant times, it and Nortel have shared the same management team.  Nortel holds all of the outstanding shares of NNL's common stock.  Certain of Nortel's publicly-traded debt securities, which are registered with the Commission pursuant to Exchange Act Section 12(b) and trade on the New York Stock Exchange, are guaranteed by NNL.  NNL has outstanding shares of preferred stock which trade publicly on the Toronto Stock Exchange.  NNL's financial results are consolidated into Nortel's publicly reported financial statements.  NNL also files periodic reports with the Commission containing its own financial statements.

## OTHERS

28.    **Frank A. Dunn**, 53, is a Canadian citizen last known to be residing in Ontario, Canada.  Dunn, a Certified Management Accountant, spent his entire career with Nortel and its predecessor companies after graduating from college in 1976.  He became CFO of Nortel in March 2000.  He was CFO of Nortel and NNL from May 1, 2000 to October 31, 2001 and was Acting CFO of Nortel and NNL from February 2002 to July 2002.  Dunn became President and CEO of Nortel and NNL effective November 1, 2001.  He was a director of Nortel and NNL beginning in May 2000.  Dunn was terminated for cause as President and CEO on April 28, 2004 and he resigned as a director effective May 21, 2004.  On March 12, 2007, the Commission named Dunn as a defendant in its securities fraud action pending in the United States District

Court for the Southern District of New York: <u>United States Securities and Exchange</u> <u>Commission v. Frank A. Dunn, et al.</u>, 07-CV-2058 (Preska, J.)

29.    **Douglas C. Beatty**, 52, is a Canadian citizen and Chartered Accountant last known to be residing in Ontario, Canada. Beatty joined Northern Telecom (Nortel's predecessor) in October 1986 and worked there until December 1995, when he left to work for another company. He returned to Nortel in March 1999 to become its Controller. He was Controller of Nortel and NNL from May 1, 2000 until July 17, 2002, when he was promoted to CFO of Nortel and NNL. Beatty was placed on leave of absence on March 15, 2004 and, on April 28, 2004, he was terminated for cause. On March 12, 2007, the Commission named Beatty as a defendant in its securities fraud action pending in the United States District Court for the Southern District of New York: <u>United States Securities and Exchange Commission v. Frank A.</u> <u>Dunn, et al.</u>, 07-CV-2058 (Preska, J.)

30.    **Michael J. Gollogly**, 48, is a Canadian citizen and Chartered Accountant last known to be residing in Ontario, Canada. Gollogly joined Northern Telecom (Nortel's predecessor) in October 1996 as an Assistant Vice President for Corporate Reporting and subsequently held various positions within the Company. He became Nortel's and NNL's Controller in July 2002. Gollogly was placed on leave of absence on March 15, 2004 and, on April 28, 2004, he was terminated for cause. On March 12, 2007, the Commission named Gollogly as a defendant in its securities fraud action pending in the United States District Court for the Southern District of New York: <u>United States Securities and Exchange Commission v.</u> <u>Frank A. Dunn, et al.</u>, 07-CV-2058 (Preska, J.)

31.    **MaryAnne E. Pahapill (a/k/a Mary Anne Poland)**, 46, is a Canadian citizen and Chartered Accountant last known to be residing in Ontario, Canada. Pahapill joined Northern Telecom (Nortel's predecessor) in April 1998 as its Vice President of Corporate

Reporting.  She was given the additional title of Assistant Controller of Nortel in February 1999, and Assistant Controller of NNL in May 2000, and held those positions until May 2001.  She was Nortel's and NNL's Controller from March 15, 2004 until her resignation, which became effective February 7, 2005.  On September 15, 2006, Pahapill notified a Commission staff attorney that she has "reverted" to her legal maiden name of "Mary Anne Poland."  On March 12, 2007, the Commission named Pahapill as a defendant in its securities fraud action pending in the United States District Court for the Southern District of New York:  <u>United States Securities and Exchange Commission v. Frank A. Dunn, et al.</u>, 07-CV-2058 (Preska, J.)

## **NORTEL'S FRAUDULENT SCHEMES**

32.     Nortel's culture had long been extremely target-driven.  It was understood across the Company that either missing or exceeding a financial target reflected a failure to manage the Company's business properly.  Dunn, as CFO and later as President and CEO, reinforced this culture by, among other things, reviewing and inquiring about particular accounting entries during the quarterly and year-end closing processes, and, more generally, through his constant emphasis on the importance of hitting targets and his well-known disregard for internal accounting and financial controls.  In that environment, accounting did not serve to measure Nortel's performance; instead, Nortel's executives and finance managers treated their books as tools to meet the Company's financial objectives.

33.     In January 2000, Nortel began reporting its results under US GAAP.  The Company, however, did not update its internal accounting guidelines to conform to US GAAP and, at best, offered sporadic and superficial training to its employees.  Nortel thereby maintained the ability to – and did – selectively apply or disregard US GAAP concepts as desired to meet its financial targets.

A.    **The First Scheme:  Revenue Recognition Fraud**

34.      On July 25, 2000, Nortel made public its financial results for the second quarter of 2000 ("Second Quarter 2000 Earnings Release") and announced that it was raising its outlook for the remainder of 2000.  The Company's revised outlook primed the market to expect revenue growth from Nortel of over 40 percent for the year, up from Nortel's previous guidance of 30 to 35 percent, and to expect operating earnings growth in the "high 30s."  During an earnings conference with analysts on the same day ("Second Quarter 2000 Earnings Call"), analysts were told that Nortel's second quarter results and its newly-announced expectation for the year were attributable to the performance of its optical business:

> This is being driven obviously by a very, very strong performance of our optical business.  Revenue growth in optical in [the second] quarter was, once again, 150%.  I think the last time that we had this call we talked about our ambitions to break $10 billion of shipments in optical business this year.  Now we feel quite comfortable we'll exceed that number and we'll have a number for the year that will be somewhere north of $10 billion of shipment for the year.

Nortel's then CEO later suggested that optical revenues might possibly reach $12 billion.  The Second Quarter 2000 Earnings Release also attributed Nortel's revised growth expectations to "the momentum we have been experiencing during the first half of this year, supported by an 85 percent increase in order input and a 1.35 book to bill in the quarter."  With respect to the third quarter of 2000, Nortel told analysts:  "We are gaining momentum so we do have a very solid quarter coming."

1.      *Third Quarter 2000:  Nortel Withholds*
        *Its Plummeting Internal Expectations From The Public*

35.      Not long after releasing its second quarter 2000 financials, Nortel experienced an extreme softening of orders, which, in turn, caused it internally to lower its expectations for the rest of the year.  On or around September 15, 2000, internal forecasts for Nortel's business units

showed that the Company expected to miss its third quarter revenue targets by at least $405 million, and its third quarter earnings targets by at least $506 million.

36.     By October 17, 2000, Nortel determined that its yearly revenues were off by more than $1 billion from expectations.  Nortel's business unit finance personnel noted:

- "Lost $1.9 [billion in] 2nd half [2000] revenue over last 4 weeks";

- "Margin shows no sign of recovery"; and

- "1st half 2001 already $1.5 [billion] off expectation."

Anticipated orders from multiple large customers were, in some cases, below expectations by hundreds of millions of dollars.  The optical sales forecast was at least $500 million below the $10 billion to $12 billion level for which Nortel had primed the market.  At the time, it was also noted that third quarter 2000 revenues were $900 million less than Nortel originally had budgeted.  Further, as of October 17, 2000, Nortel's expected fourth quarter 2000 earnings were at least $320 million short of the amount needed to meet consensus earnings per share.

37.     Nortel did not share any of this information with the public.  Instead, it continued to make optimistic forecasts which, by this point, could not be met through operations alone.

38.     In an earnings release dated October 24, 2000, Nortel made public its financial results for the third quarter of 2000 ("Third Quarter 2000 Earnings Release").  The Company reported third quarter revenues of $7.31 billion and net earnings of $574 million (or $0.18 per share).  Although its earnings for the quarter exceeded analyst expectations by 1 cent per share, analysts expressed concern that revenues came in at the low end of the expected range of $7.3 billion to $7.8 billion.

39.     During Nortel's October 24, 2000 earnings call ("Third Quarter 2000 Earnings Call"), analysts expressed concern about Nortel's sales of optical internet gear and questioned whether Nortel expected lower optical sales for the remainder of 2000.  The Company reassured

analysts that it expected to sell out of its optical gear in the fourth quarter and rejected the suggestion that there was a slow-down in performance or growth.  Instead it blamed third quarter results on, among other things:  (i) slow installations of optical equipment and (ii) customers who were working through existing supplies but were expected to place sales in the fourth quarter of 2000.  Nortel told the public there was no change in its guidance for 2000 and reaffirmed its prior-announced growth expectations for 2000, stating:  "We continue to expect that our percentage growth in revenue and earnings per share from operations in 2000 … will be in the low 40's."  Nortel also continued to predict that "annual optical equipment sales will surpass $10 billion" in 2000, albeit, there was no mention of the $12 billion optical sales figure that Nortel's then CEO had mentioned as a possibility in September 2000.  Nortel's stock price fell more than 34 percent over the next two days.

40.      External pressure to increase revenues (particularly from sales of optical equipment, which, at the time, made up a significant portion of Nortel's revenues and were closely followed by analysts) mounted.  Nortel – led by its then CFO, Controller and Assistant Controller – embarked on a scheme to manipulate its results for the remainder of 2000 through accounting changes.

### 2.    *Fourth Quarter 2000:  Nortel Manipulates Its Revenue Recognition Policies To Meet Targets*

41.      In late October 2000, Nortel's then Controller met with the then Assistant Controller and other senior finance managers to discuss ways to increase the Company's revenues (particularly optical revenues) for the remainder of 2000.  Among the issues discussed were Nortel's revenue recognition policies and the effect of such policies on Nortel's ability to reach its revenue targets for 2000.

42.      The Company was particularly eager to find a solution for the hundreds of millions of dollars in inventory (consisting primarily of optical products) sitting in its warehouses and offsite storage locations.  Revenues could not be recognized for this inventory because US GAAP revenue recognition rules generally require goods to be delivered to the buyer before revenue can be recognized.

43.      Nortel's inventory levels had grown, in part, because orders for its optical inventory had slowed and Nortel had experienced delays in installing optical products.  Additionally, in June 2000, Nortel banned bill and hold transactions from the Company's sales and accounting practices.  A bill and hold transaction is one where the customer agrees to purchase a product but the seller (here Nortel) retains physical possession until the customer can accept delivery.  US GAAP permits revenue from a bill and hold transaction to be recognized prior to delivery, if certain stringent criteria, described in Paragraph 46, are met.  Once revenues are recognized, the product no longer appears on the seller's books as inventory.  When Nortel banned bill and hold transactions in June 2000, it no longer could recognize as revenue, or remove from inventory, equipment that had been sold but not yet delivered.  Nortel had banned bill and hold transactions because its executives had concluded that US GAAP requirements for such transactions were too difficult to meet, such transactions were being "scrutinized" by the Commission, and also because second quarter 2000 revenues were sufficiently robust without the use of such transactions.  However, throughout the third and fourth quarters of 2000, as revenue pressures and inventory levels increased, and as Wall Street increasingly focused on Nortel's optical numbers, pressure mounted for Nortel to repeal the ban.  The ban on bill and hold transactions was short-lived.

### a.    *Reintroduction Of Bill And Hold Transactions*

44.       In late October 2000, as a first step toward re-introducing bill and hold

transactions into Nortel's sales and accounting practices, Nortel's then Controller and Assistant

Controller asked Nortel's outside auditor to explain, among other things, (i) "[u]nder what

circumstances can revenue be recognized on product (merchandise) that has not been shipped to

the end customer?" and (ii) whether merchandise accounting can be used to recognized revenues

"when installation is imminent" or "when installation is considered to be a minor portion of the

contract"?

45.       On November 2, 2000, the outside auditor presented Nortel with a set of charts

which, among other things, explained the US GAAP criteria for revenues to be recognized prior

to delivery (including additional factors to consider for a bill and hold transaction) and also

provided an example of a customer request for a bill and hold sale "that would support the

assertion that Nortel should recognize revenue" prior to delivery.

46.       US GAAP permits revenue from a bill and hold transaction to be recognized prior

to delivery of the goods only if certain stringent criteria are met, including:  (i) risk of ownership

must have passed to the buyer; (ii) the buyer must have made a fixed commitment to purchase

the goods; (iii) the buyer (not the seller) must request the transaction be on a bill and hold basis

and must have a substantial business purpose for ordering the goods on a bill and hold basis;

(iv) there must be a fixed schedule for delivery of the goods; (v) the seller must not have retained

any specific performance obligations such that the earnings process is not complete; (vi) the

ordered goods must be segregated from the seller's inventory and not used to fill other orders;

and (vii) the goods must be complete and ready for shipment.  Also relevant to the analysis is

whether the seller has modified its normal billing terms, whether the buyer has the expected risk

of loss in the event of a decline in the market value of the goods, and whether the seller's custodial risks are insurable and insured. If all of the above criteria are not met, revenue recognition must be deferred until either the bill and hold criteria have been satisfied or physical delivery has occurred.

47.     On November 7, 2000, Nortel internally distributed its own revenue recognition guidance, which consisted of charts that had been drafted by Nortel's then Controller and Assistant Controller. Nortel's guidance announced a change in accounting policy for sales of, among other things, optical products, which previously had been accounted for under a percentage of completion method but could now use merchandise accounting and be sold using bill and hold transactions. However, Nortel's guidance omitted key portions of the outside auditor's presentation relating to US GAAP requirements for bill and hold transactions. For example, in discussing bill and hold transactions, Nortel's guidance contained no mention that (i) the customer must request that the transaction be on a bill and hold basis or (ii) the customer must have a substantial business purpose for ordering the goods on a bill and hold basis. Other US GAAP criteria were omitted from Nortel's guidance as well.

48.     The outside auditor had reviewed Nortel's guidance before November 7, 2000, and warned Nortel that it was too brief and did not give the intended users – Nortel's accounting and finance personnel – sufficient information to always make the correct assessment of the appropriate accounting treatment. The outside auditor asked, but Nortel declined, to distribute the outside auditor's guidance as well.

49.     Nortel's accounting guidance reintroduced bill and hold transactions into the Company's sales and accounting practice in November 2000. This reversal in Nortel's approach to bill and hold transactions was designed to improve inventory levels, including particularly the

level of optical equipment inventory which had been a strong focus of the third quarter earnings conference, and to assist the Company in meeting its public forecasts for 2000.

50.    On November 8, 2000, Nortel's Controller informed the recipients of Nortel's revenue recognition guidance – certain Nortel accounting and finance employees – that Nortel was having difficulty meeting its fourth quarter 2000 revenue targets and that bill and hold transactions were being reintroduced to assist Nortel in meeting those targets.  He directed them to formulate a plan to implement the new guidance.

51.    A plan was developed within days.  The plan was for Nortel to approach and urge certain customers to execute so-called "risk of loss letters" (Nortel's parlance for bill and hold transactions) for undelivered inventory.  Customers that were unlikely to take delivery of ordered inventory by year end were to be identified and targeted.  Nortel's Controller and Assistant Controller understood that the proposed plan would lead to transactions not consistent with US GAAP, or the outside auditor's guidance, but, they approved the plan anyway, with the knowledge and acquiescence or recklessness of Nortel's then CFO, and Nortel's fraud was thereby set in motion.

52.    Starting in November 2000, Nortel systematically approached targeted customers and urged them to execute risk of loss letters.  Customers that previously had placed orders were approached and asked to restructure their agreements.  Customers that told Nortel they expected to place orders and take delivery in 2001 were provided incentives to execute risk of loss letters in 2000.  New customers were also asked to execute risk of loss letters.  Nortel induced such customers with offers of price discounts, interest deferments and extended billing terms.  The vast majority of transactions entered into had no substantial business purpose for the buyer. Further, though Nortel knew that bill and hold transactions must be initiated by the customer, Nortel initiated the transactions.  Moreover, in an effort to create the false appearance that the

risk of loss letters had been customer-initiated, Nortel typically drafted the risk of loss letter and submitted it to the customer to be printed on customer letterhead.

53.    Nortel's risk of loss letters did not comply with US GAAP requirements and, thus, revenues were not permitted to be recognized on such transactions prior to delivery. Nortel, nonetheless, did recognize revenues on such transactions prior to delivery and thereby improperly accelerated revenues into 2000 through bill and hold transactions that did not comply with US GAAP.

54.    As part of its Second Restatement, Nortel reversed approximately $1 billion in revenues that had been improperly recognized in the fourth quarter of 2000 through these improper bill and hold transactions.

### b.    Recognition Of Revenues On Sales To A Pass-Through Entity

55.    In the fourth quarter of 2000, Nortel improperly recognized revenues upon delivery of millions of dollars of its goods to Telamon Corporation ("Telamon"), a pass-through entity for certain business deals.

56.    Nortel used Telamon, a minority-owned business, to satisfy the business requirements of certain Nortel customers. Those customers were required to make a percentage of purchases from minority- or women-owned businesses; accordingly, rather than purchase Nortel's products directly, they purchased Nortel's products from Telamon.

57.    Nortel recognized revenue when it delivered goods to Telamon. Telamon, however, did not accept the risks of ownership of the Nortel products. It could not (and did not) pay for the products until such products had been resold and Telamon had received payment from the end customer. Telamon also routinely returned unsold products to Nortel. Indeed, in

2000, Telamon returned hundreds of millions of dollars of goods to Nortel that it was unable to resell due to softening orders.

58.       Telamon served merely as a pass-through entity for Nortel, yet, Nortel recognized revenues throughout 2000 upon delivery of its products to Telamon.  This did not comport with US GAAP which provides, generally, that revenue from sales to intermediate parties for resale should be recognized only when the risks and rewards of ownership have passed.  When, as here, the reseller is acting, in substance, as an agent, the sale is treated as a consignment sale and revenue should not be recorded until the reseller has delivered the product to the end user.

59.       In the fourth quarter of 2000, Nortel's then Controller considered but rejected the idea of changing its practice so that revenues would not be recognized on Telamon sales until the end customer had paid for the goods.  Nortel's CFO, Controller and Assistant Controller likewise discussed but decided against correcting the policy during the 2000 year-end closing process. The decision, both times, was influenced by the fact that changing the practice would negatively impact Nortel's revenues for its optical business unit.

60.       Nortel improperly recognized approximately $150 million in revenues for sales to Telamon in the fourth quarter of 2000.  These revenues were ultimately reversed by Nortel's Second Restatement and, starting in 2001, Nortel began to recognize revenues on Telamon sales when the risk of ownership had passed to the end customer.

### c.       Recognition Of Revenues Before Passage Of Title

61.       As part of the fourth quarter 2000 push to increase revenues, Nortel improperly recognized revenues on certain sales at the time of product shipment even though title to the product did not pass until delivery had been made to the customer.  The Company conveniently assumed that delivery typically occurred within seven days of shipment.  No testing was done to

validate the assumption, which was incorrect. As part of its Second Restatement, Nortel reversed $50 million in revenues that had been improperly recognized in the fourth quarter of 2000, where title did not pass to its customers until the first quarter of 2001.

### d. Recognition Of Revenues For Substituted Products

62.     Nortel improperly recognized revenues during 2000 for an optical upgrade product known as "DX3" that was not yet available for shipment. Specifically, in the fourth quarter of 2000, as a result of product delays, Nortel was unable to deliver the DX3 product. It implemented a temporary work-around to deliver the capacity of the DX3 upgrade by shipping two DX1 products – which had the combined capacity of one DX3 – to serve as a placeholder until the DX3 could be completed. Nortel recognized revenues as if it had delivered the DX3 product. Such revenues contributed to Nortel's ability to meet its public guidance of $10 billion in optical revenues for fourth quarter 2000. As part of its Second Restatement, Nortel reversed $178 million in optical revenues that it had improperly recognized on sales of its DX3 product.

### e. The Partial Reversal of Revenues In Response To The Success Of Nortel's Revenue Recognition Manipulations

63.     The revenue recognition manipulations that Nortel engaged in during 2000 pulled in more revenue than necessary for Nortel to meet its publicly-announced revenue guidance for fiscal year 2000. It was apparent no later than the first week of January 2001 that Nortel would exceed its targets for fiscal year 2000 by at least $500 million. Indeed, on January 5, 2001, Nortel's corporate financial planning group concluded that "[e]arnings are there, but [r]evenue is too high." Nortel executives reacted by selectively reversing certain low margin, non-optical revenue items during the fiscal 2000 year-end closing process in order to reduce revenues but not affect earnings.

64.       On January 5, 2001, Nortel's Controller directed the Assistant Controller and several of Nortel's vice presidents of finance to find low margin, non-optical revenue entries for reversal.  Proposed reversal entries were submitted for consideration.  The point of the effort not only was to bring Nortel's revenues in line with its guidance for 2000, but also to preserve Nortel's optical revenue and consolidated earnings results.

65.       On January 7, 2001, Nortel's CFO, Controller, Assistant Controller and others held a conference call to discuss the proposed reversal entries in detail and to cull from the list those entries that would reduce revenues but not significantly affect optical revenues or consolidated earnings.  They reviewed each proposed entry, determined its impact on revenues, optical revenues and consolidated earnings, and then selected specific entries to reverse or not, based upon their impact.  Certain bill and hold transactions had been proposed for reversal, but, those transactions had primarily impacted optical revenues, and thus other transactions were selected for reversal.  This process enabled Nortel to precisely engineer its fourth quarter 2000 results such that the Company met but did not exceed public forecasts.

> f.       **Nortel's Materially False And Misleading**
> **Fourth Quarter 2000 Earnings Release**
> **And 2000 Form 10-K**

66.       On January 18, 2001, Nortel issued an earnings release which made public its financial results for the fourth quarter of 2000 ("Fourth Quarter 2000 Earnings Release").  The release reported revenues of $8.82 billion for the fourth quarter (a 34 percent increase from the corresponding quarter in 1999) and revenues of $30.28 billion for the year (a 42 percent increase from 1999).  The release stated that "the fourth quarter capped a year of exceptional growth, which was in line with … expectations."  It touted, among other things, Nortel's optical revenues, which "topped $10 billion for the year, more than doubling 1999 revenues" and attributed its optical revenues to "strong growth" in the United States and other geographic

regions.  Nortel also confirmed its financial guidance for fiscal year 2001, saying that it expected revenue and earnings to grow by 30 percent in 2001, a lower growth rate than in prior years.

67.     Nortel carefully crafted the timing of its Fourth Quarter 2000 Earnings Release to mislead investors about its performance just long enough for it to complete a $2.5 billion acquisition in February 2001.  On February 13, 2001, with the benefit of an artificially-inflated share price, Nortel paid $2.5 billion to acquire 980 NPLC, JDS Uniphase's Swiss subsidiary, and related assets in New York.  Nortel issued 65.7 million shares of common stock as consideration for the purchase.  The price of those shares was artificially inflated because it was based on Nortel's fraudulent fourth quarter 2000 results, and because Nortel predicted strong growth in 2001, despite knowing that its business was softening and that it had drawn revenues out of 2001 in order to meet its fourth quarter 2000 forecasts.

68.     On March 31, 2001, Nortel filed with the Commission its annual report on Form 10-K for the period ending December 31, 2000 ("2000 Form 10-K").  The 2000 Form 10-K reported revenues of $8.818 billion for the fourth quarter of 2000 and $30.275 billion for the year and represented that the financial statements therein were prepared in conformity with US GAAP.

69.     Nortel reported materially overstated fourth quarter and year-end 2000 revenues in its Fourth Quarter 2000 Earnings Release and its 2000 Form 10-K.  Specifically, at the time, absent the improper accounting manipulations described above, Nortel would have reported fourth quarter revenues of approximately $7.42 billion (16% less) and year-end revenues of approximately $28.87 billion (5% less).

70.     Nortel's Fourth Quarter 2000 Earnings Release misrepresented and/or omitted at least the following facts, disclosure of which was necessary to make the statements made not misleading:

(a)     Nortel materially overstated revenues and understated net losses for the fourth quarter and fiscal year 2000 by engaging in fraudulent accounting practices in the fourth quarter of 2000. Specifically, Nortel had implemented accounting changes which did not comport with US GAAP and resulted in the premature recognition of approximately $1.4 billion of revenues in the fourth quarter of 2000. Such accounting adjustments had a particularly positive impact on Nortel's optical revenues for 2000. Absent these manipulations, Nortel could not have met its revenue (much less its optical revenue) guidance for the fourth quarter and fiscal year 2000.

(b)     Nortel's statement about the expected growth rate of 2001 revenue and earnings was materially false and misleading because one of the reasons why revenues were expected to grow more slowly in 2001 was that Nortel's improper acceleration of revenues in 2000 had cannibalized part of its 2001 revenues.

71.     Nortel's 2000 Form 10-K misrepresented and/or omitted at least the following material facts, disclosure of which was necessary to make the statements made not misleading:

a.     The 2000 Form 10-K falsely represented, in Note 2 to the financial statements and Item 7 (Management's Discussion and Analysis of Financial Condition and Results of Operations), that Nortel's consolidated financial statements for 2000 had been prepared in accordance with US GAAP. This statement was materially false and misleading because Nortel had prematurely recognized revenue on transactions that did not satisfy US GAAP. Nortel's revenues for fiscal year 2000 would have been approximately $1.4 billion lower and its net

loss materially higher if revenues on had been recognized in accordance with US GAAP.

b.      The 2000 Form 10-K falsely represented, in Note 2 to the financial statements, that Nortel had adopted the recommendations of the Commission's "Staff Accounting Bulletin:  No.  101 – Revenue Recognition in Financial Statements" ("SAB 101") effective January 1, 2000, and that "[t]he application of SAB 101 did not have a material adverse effect on the business, results of operations or financial condition of [Nortel]."  SAB 101 sets forth certain criteria that must be met in order for a company to recognize revenue on bill and hold transactions prior to delivery.  This statement was misleading because Nortel had rejected SAB 101 and recognized revenues on bill and hold transactions that did not satisfy either SAB 101 or other US GAAP cited within SAB 101.  Moreover, the revenue that Nortel recognized pursuant to its improper bill and hold arrangements was material to an understanding of Nortel's business, results of operations and financial condition.  Specifically, Nortel recognized more than $1 billion – later reversed in the Second Restatement – from improper bill and hold transactions entered into during the fourth quarter of 2000.  If Nortel had adopted the recommendations of SAB 101, as it said, its revenues for fiscal year 2000 would have been approximately $1 billion lower than reported and its revenues from optical equipment sales would have been particularly negatively affected.

c.      The 2000 Form 10-K also purported to enumerate Nortel's revenue recognition policies in Note 2 to the financial statements.  Nortel thereby created the misleading impression that all revenues had been recognized in

      d.      The 2000 Form 10-K, in comparing Nortel's 2000 results against its 1999 results, attributed Nortel's revenue growth to "[t]he considerable increase in sales of optical networking systems" in 2000, which it said was "driven by substantial growth across all regions…." This statement was materially false and misleading because it omitted to disclose that a material part of the growth in Nortel's 2000 optical revenues (approximately $1 billion) was attributable not to natural growth, but rather, to Nortel's improper use of bill and hold transactions.

72.      The revenue figures that were misstated in the 2000 Form 10-K affected future public filings which incorporated those figures by reference, including, but not limited to: (i) Nortel's Forms 10-Q for the periods ended March 31, 2001 and June 30, 2001 and its Forms 10-Q and 10-Q/A for the period ended September 30, 2001 (respectively, "First Quarter 2001 Form 10-Q," "Second Quarter 2001 Form 10-Q," "Third Quarter 2001 Form 10-Q" and "Amended Third Quarter 2001 Form 10-Q"), (ii) Nortel's Form 10-K for the period ended December 31, 2001 ("2001 Form 10-K"), (iii) Nortel's Forms 10-Q for the periods ended March 31, 2002 and June 30, 2002 (respectively, "First Quarter 2002 Form 10-Q" and "Second Quarter 2002 Form 10-Q"), (iv) Nortel's Form 10-K for the period ended December 31, 2002 ("2002 Form 10-K"), (v) Nortel's Form 10-K/A for the period ended December 31, 2002 ("Amended 2002 Form 10-K"), (vi) Nortel's Forms  10-Q and 10-Q/A for the periods ended March 31, 2003 and June 30, 2003 (respectively, "First Quarter 2003 Form 10-Q," "Amended First Quarter 2003

Form 10-Q," "Second Quarter 2003 Form 10-Q" and "Amended Second Quarter 2003 Form 10-Q"), (vii) Nortel's Form 10-Q for the period ended September 30, 2003 ("Third Quarter 2003 Form 10-Q") and (vii) all of Nortel's Forms S-3, S-4 and S-8 filed with the Commission from March 23, 2001 through August 5, 2003.

## B.    **The Second Scheme:  Earnings Management Fraud**

73.        Nortel suffered serious losses in 2001 due to a widespread economic downturn that impacted the entire telecommunications industry.  It responded by implementing a company-wide restructuring plan, which included dismissing two-thirds of its workforce (approximately 60,000 employees), real estate closures and dispositions, write-downs of capital assets, goodwill and other intangible assets, and contract settlements with customers and suppliers.  In January 2002, for the first time since it began its restructuring, Nortel again began to issue forward-looking earnings guidance to Wall Street.

74.        During the summer of 2002, as Nortel began to emerge from its downturn, Nortel's CEO told the investment community that he expected to return Nortel to profitability by the second quarter of 2003.  The Company established a "return to profitability" ("RTP") bonus program to spur its employees toward that goal.

75.        Starting no later than the fourth quarter of 2002, Nortel embarked on a scheme to improperly establish and maintain reserves and later improperly release reserves in a calculated effort to manage the Company's earnings and deceive investors.  These efforts turned Nortel's unexpected fourth quarter 2002 *pro forma* profit into a reported loss and its first quarter 2003 loss into a reported profit; and, but for its inability to make all of the reserve releases it intended to make in the second quarter of 2003, these efforts also would have turned Nortel's second quarter 2003 loss into a reported profit.  The second quarter 2003 loss nonetheless was largely erased as a result of these efforts.

### 1. The Establishment and Maintenance
### Of Excess Reserve Balances At Nortel

76.     It was long-standing practice across Nortel to establish reserves on a "worst-case" basis, which, in practice, meant at an amount equal to the maximum possible exposure. This approach did not comport with US GAAP and resulted in the creation of reserves in amounts that far exceeded the Company's reasonable expectations for future liabilities.

77.     US GAAP states that an anticipated liability can be accrued (i.e., a reserve can be established) if it is "probable" – meaning that "[t]he future events are likely to occur" and "the amount of the loss can be reasonably estimated." If the anticipated liability falls within a range, the accrual must be based on the best estimate. Where no estimate within the range is better than any other, US GAAP requires the accrual to be set at the bottom of the range. US GAAP does not permit for reserves to be established outside of these criteria.

78.     US GAAP requires reserves to be released in the quarter in which they no longer are needed. If the excess amount is not released on a timely basis – i.e., if it is not released when the liability for which it was created has been resolved and an excess determination has been made – the company must disclose the effect of the release on the current period (if it is material) and the company must also disclose what the effect would have been if the reserve had been timely released, and it may be required to restate previous financial statements.

79.     Nortel's top executives ensured that reserves would be established in excess of the Company's liabilities by making it known that unanticipated losses would not be tolerated where reserves had not been set high enough. Finance managers across the Company were also encouraged to establish excess reserves when their quarterly results exceeded forecasts. As Nortel's Controller explained in an email to his subordinates, "[Nortel's] general approach is to

sand bag good news and close 'hard' to the forecast."  These practices, and others, led to the establishment of unnecessary reserves across the Company.

80.       In addition to establishing excess reserves as part of the normal course of business, Nortel also "topped up" existing reserve accounts in 2001, when it underwent a company-wide restructuring.  Specifically, in connection with the restructuring, Nortel established massive reserves for severance and fringe benefits costs, lease termination costs, and costs related to the disposal of assets, but, on top of that, it also added arbitrary excess amounts for reasons having nothing to do with actual anticipated liabilities.

<em><strong>a.       Quantification Of Existing Excess Reserves</strong></em>

81.       By the summer of 2002, investment analysts began to question the enormous size of Nortel's accrued liabilities.  In particular, analysts questioned why the accrued liabilities number remained so high throughout the restructuring given that, by this point, Nortel was about one-third of its former size.

82.       Nortel undertook a company-wide survey to ascertain the status of and quantify its reserve balances.  Its corporate consolidation staff, over the next few months, compiled data showing hundreds of millions of dollars in excess reserves at both the corporate and business unit levels.

83.       By October 2002, Nortel had determined it was carrying at least $303 million in excess reserves on its balance sheets.  Among those were the following corporate-level reserve accounts:

F. Dunn Discretionary Provision (a/k/a Degree of Difficulty Provision)<br>
Intercompany Out of Balance<br>
R&D Out of Balance<br>
Short Close Exposure<br>
EDSN Minority Interest<br>
Montreal Consolidation<br>
QST Provision

Siemens Settlement
Global Crossing
QWEST
General Provision

Some of these reserve accounts had loosely-identified purposes.  One account was simply labeled "General Provision," which the corporate control staff described as "left in place per [Nortel's then CFO]."  Another account labeled "F. Dunn Discretionary Provision" was described by Nortel's corporate control staff as "left in place per [Nortel's then CEO]."  Other reserve accounts were maintained on justifications that shifted from period to period.

84.        Under US GAAP, because these known excess reserves would have been material to Nortel's results at the time, they should have been released immediately, disclosed publicly, and Nortel should have restated its financial results to reflect the proper periods into which the reserves should have been released.  Instead the Company maintained these excess reserves for future earnings management purposes as needed.

### b.        *Creation of Additional Excess Reserves*

85.        Nortel had groomed market expectations throughout 2002 by telling investment analysts that its goal was to return to profitability by the second quarter of 2003.  On July 18, 2002, during Nortel's second quarter 2002 earnings call, the Company's CEO told analysts that "by June of next year I expect to … turn profitable."  The Company's CFO reiterated this guidance on October 17, 2002, during Nortel's third quarter 2002 earnings call, when he told analysts:

> We are continuing to target profitability by the second quarter of 2003….  This drive to profitability is based on the targeted breakeven model of the quarterly revenues of below $2.4 billion. Having further worked with specific plans in recent weeks, we expect to support this business model with approximately 35,000 people and expect to have most of the actions completed by the end of 2002.

The Company thereby had conveyed the impression that its performance was stabilizing and marching consistently toward profitability under its management.

86.　　　By December 2002, however, Nortel internally determined that it would show a *pro forma* profit for the fourth quarter of 2002, two quarters earlier than expected.  (At the time, Nortel reported *pro forma* figures alongside its US GAAP results and its *pro forma* profit for the fourth quarter of 2002 would have been reported publicly.)  This would have been contrary to Nortel's statements to the public that it expected a return to profitability in the second quarter of 2003, and contrary to statements Nortel's CEO and CFO had made to Nortel's Board of Directors in December 2002, that they anticipated a loss of approximately $65 million for the fourth quarter of 2002.  Moreover, a *pro forma* profit in the fourth quarter of 2002 would trigger payouts under Nortel's "return to profitability" ("RTP") bonus program.  Nortel's CEO believed investors would not react favorably to a payment of millions of dollars of bonuses at the end of a year in which the Company lost over $3 billion from its continuing operations.

87.　　　Nortel reacted to this unexpected news of a fourth quarter 2002 *pro forma* profit by establishing additional excess reserves to ensure that it would instead post a loss.  The Company's concern, at the time, was that it might show a loss in the first quarter of 2003, and, thus, any fourth quarter 2002 profit would be seen as an aberration that did not reflect a stable return to profitability.

88.　　　Nortel's Controller spearheaded the effort.  He instructed Nortel's director of corporate financial planning to contact the vice presidents of finance of Nortel's business units, and certain regional finance and control managers and to direct them to accrue additional reserves.  Nortel's CFO and Controller also contacted certain finance personnel directly to encourage them to find more reserves to establish for the quarter.

89.       Proposed reserve entries were submitted to Nortel's Controller and his staff between January 6 and 8, 2003, and were incorporated into Nortel's results until fourth quarter 2002 earnings were reduced to within a few million dollars of the $65 million loss that had been internally predicted and shared with Nortel's Board of Directors.

90.       Through these eleventh-hour efforts, Nortel made $176 million in downward earnings adjustments, thereby creating a loss for the fourth quarter of 2002.  The Company thereby avoided showing a *pro forma* profit sooner than it had forecast in its public guidance.

91.       Further, in order to maintain the precise earnings result that it had so carefully engineered for the fourth quarter of 2002, Nortel carried out yet another last-minute manipulation of its earnings.  On or about January 22, 2003 – the day before fourth quarter 2002 results were announced – Nortel decided it needed to change its accounting for its acquisition of the JDS Uniphase subsidiary, 980 NPLC.  This accounting change had the unexpected effect of reducing Nortel's earnings and thus increased its fourth quarter 2002 loss by approximately $25 million. To counter the impact of the $25 million charge, Nortel reversed $25 million of excess reserves that had been established in early January 2003.  Nortel had planned to make $176 million in downward earnings adjustments, but instead, it made $151 million.

92.       On January 23, 2003, Nortel issued an earnings release which made public its financial results for the fourth quarter of 2002 ("Fourth Quarter 2002 Earnings Release").  The release reported a *pro forma* loss for the quarter of $62 million (or $0.01 per share) and US GAAP loss for the quarter of $248 million (or $0.06 per share).  The Earnings Release stated that the Company was "just short of *pro forma* profitability in the quarter" and had stabilized its business model.  The Earnings Release further stated that "[a]s [Nortel] enter[s] 2003, the focus on profitability will continue."

93.     On March 10, 2003, Nortel filed with the Commission its annual report on Form 10-K for the period ending December 31, 2002 ("2002 Form 10-K").  The 2002 Form 10-K represented in the "Quarterly Financial Data (Unaudited)" section that the Company's fourth quarter 2002 net loss was $248 million and its "basic and diluted loss per common share" was $0.06 per share.

94.     Nortel's establishment of additional excess reserves during the 2002 year-end closing process caused Nortel to report materially overstated losses in its Fourth Quarter 2002 Earnings Release and 2002 Form 10-K.  Specifically, at the time, absent Nortel's downward adjustments of $151 million, Nortel would have reported a *pro forma* profit of $89 million instead of a *pro forma* loss of $62 million and it would have reported a fourth quarter US GAAP loss of approximately $97 million (or a $0.02 US GAAP loss per share) instead of a $248 million loss (or $0.06 US GAAP loss per share).

95.     Nortel's Fourth Quarter 2002 Earnings Release misrepresented and/or omitted at least the following material facts, disclosure of which was necessary to make the statements made not misleading:

(a)     Before Nortel's year-end 2002 financial statements were finalized, $151 million in improper downward earnings adjustments were made for the express purpose of reducing the Company's fourth quarter earnings and reporting a fourth quarter loss.  These adjustments were attributable primarily to the establishment of excess reserves.  Such adjustments caused Nortel to materially overstate its *pro forma* net losses for the quarter and materially overstate its US GAAP losses for the quarter and year.  Absent the $151 million downward adjustment, Nortel would have reported a *pro forma* profit

(instead of a *pro forma* loss) for the quarter and its US GAAP loss would have been reduced by more than half.

(b)    The Company was holding more than $400 million of excess reserves on its books. These excess reserves were not disclosed and were not released into their proper periods, but rather, they were being improperly maintained on Nortel's books and records for future earnings management purposes.

96.    Nortel's 2002 Form 10-K misrepresented and/or omitted at least the following material facts, disclosure of which was necessary to make the statements made not misleading:

(a)    The 2002 Form 10-K falsely represented in Note 2 to the financial statements and Item 7 (Management's Discussion and Analysis of Financial Condition and Results of Operations) that Nortel's consolidated financial statements for 2002 had been prepared in accordance with US GAAP. This statement was materially false and misleading because Nortel inappropriately made approximately $151 million in downward earnings adjustments that did not satisfy US GAAP.

(b)    The 2002 Form 10-K falsely represented the Company's fourth quarter results in the "Quarterly Financial Data (Unaudited)" section of the financial statements. The section states that the Company had a achieved a net loss of $248 million (or $0.06 per share) in the fourth quarter of 2002. These results were caused by the $151 million in improper downward earnings adjustments. Absent such improper adjustments, the Company's fourth quarter net loss and loss per share would have been less than half that reported.

(c)    The 2002 Form 10-K purported to describe Nortel's policy for establishing reserves in Item 7 (Management's Discussion and Analysis of Financial

Condition and Results of Operations), under the heading "Application of Critical Accounting Policies." Nortel claimed that it recognized reserves "when it is probable that an asset has been impaired or a liability has been incurred and the amount of loss can be reasonably estimated." That statement was false and misleading because Nortel's common practice was to set reserves at the greatest possible liability, without regard to any reasonable estimation of the liability. The description was also misleading because the manner in which Nortel established reserves during the fourth quarter closing process did not comport with any of the disclosed policies; specifically, the 2002 Form 10-K made no mention of the fact that the Company established unnecessary reserves during the fourth quarter closing process simply to lower the Company's consolidated earnings. The description of Nortel's policy also claimed that Nortel "regularly evaluate[d] current information available to us to determine whether such accruals should be adjusted." That statement was misleading because it gave no indication that the practice across Nortel was to adjust reserve amounts as necessary to meet quarterly earnings targets.

(d)    The Company was holding more than $400 million of excess reserves on its books, which the 2002 Form 10-K did not disclose and which were not released into their proper periods, but rather, were being improperly maintained for future earnings management purposes.

## 2.    _Releases of Excess Reserves to Fabricate Profits_

97.    The change that Nortel made in January 2003 to its accounting for the acquisition of the JDS Uniphase subsidiary, 980 NPLC, not only impacted Nortel's results for the fourth quarter of 2002, but also caused Nortel internally to revise downward its earnings forecasts for

fiscal year 2003.  Nortel's previously forecasted *pro forma* profit (of $220 million) for 2003,
became a forecasted *pro forma* loss (of $44 million) for 2003.  The accounting change threatened
Nortel's ability to return to profitability by the second quarter of 2003.  It also threatened
Nortel's ability to pay RTP bonuses in 2003.

98.     Despite this, Nortel continued to tell the public that it expected to achieve *pro
forma* profitability by the end of June 2003.  Nortel's Fourth Quarter 2002 Earnings Release, for
example, reaffirmed its earlier guidance that it expects to achieve *pro forma* profitability by the
second quarter of 2003.

99.     To ensure that its guidance was met, the Company refused to accept this turn of
events and instead fabricated profits by releasing excess reserves company-wide during the first
quarter of fiscal year 2003.

### a.     *First Quarter 2003*

100.     Nortel reacted to the downward-revised internal forecast for 2003 by setting new
(and higher) earnings targets for its business units the first and second quarters of 2003.  The
goal was for the Company to achieve actual US GAAP profitability in the first quarter of 2003
and to pay RTP bonuses.  The Company's corporate financial planning group was instructed to
devise plans, called "roadmaps," to assist the Company in achieving its goal.

101.     Nortel's CEO regarded RTP bonuses – payment of which was triggered by *pro
forma* profitability – as necessary to hold together his management team.  He believed, however,
that paying RTP bonuses based on *pro forma* profits would anger investors if Nortel did not also
turn a true profit under US GAAP and thus he placed great importance on reaching an "all-in
GAAP profit" in the first quarter of 2003 too.

102.     Nortel's corporate financial planning group, as instructed, created and distributed
roadmaps which reflected (i) revised consolidated earnings targets for Nortel and (ii) how much

each business unit was expected to contribute to Nortel's newly-established earnings targets.  On February 19, 2003, those earnings targets were conveyed to Nortel's business unit vice presidents of finance and regional finance managers.  They were told that the goal was for Nortel to generate a profit for the first quarter of 2003.

103.    While Nortel was scheming to return to profitability, its actual results were worsening.  On or about March 22, 2003, internal forecasts stated that revenues were "softening versus [business unit] budgets" and that "Q1 and Q2 results [were] dependent on non-operating clean ups."  This caused Nortel to increase the planned release of corporate excess reserves to meet its first quarter profitability target.

104.    The profit targets set for the first quarter of 2003 were ultimately met, in part, through Nortel's release of $361 million in reserves.  Approximately $272 million of those reserves were excess reserves specifically released to meet earnings and bonus targets for the first quarter of 2003.  Nortel continued to maintain other known excess reserves for future use as needed.

105.    On April 24, 2003, Nortel issued an earnings release which made public its financial results for the first quarter of 2003 ("First Quarter 2003 Earnings Release").  The release reported that Nortel had achieved US GAAP net earnings of $54 million (or $0.01 earnings per share) for the first quarter of 2003.  Nortel's CEO touted his success, stating that he was "extremely pleased to have achieved profitability in the first quarter of 2003 and reached [his publicly stated] goal one quarter early."  Rather than disclose the real reason for Nortel having achieved profitability in the first quarter of 2003, the CEO instead attributed Nortel's profitability to a strong business model:

> Before I talk about the market, our product position, some of the events that have taken place, let me make a few comments on the results of the first quarter.  I'm delighted with the results.  We're

> profitable for the first time in three years, over three years, and we
> met our profitability objective one quarter early.  We had very
> strong margin performance and we continue to focus on driving a
> business model that continues to accelerate our margin as an
> overall objective in this business.  We had positive results in our
> cash.  Our cash from operations before restructuring costs
> generated cash.  And again, that's a very important milestone for
> us and we're very focused on that aspect.

106.    On May 9, 2003, Nortel filed with the Commission its quarterly report on Form

10-Q for the period ending March 31, 2003 ("First Quarter 2003 Form 10-Q").  Nortel reported

US GAAP net earnings of $54 million ($0.01 per share) for the first quarter of 2003.  In Note 3

to the financial statements ("Consolidated Financial Statement Details – Other") and Item 2

("Management's Discussion and Analysis of Financial Condition and Results of Operations"),

Nortel stated that:

> [d]uring the three months ended March 31, 2003, Nortel Networks
> net earnings (loss) included approximately $80 [million] of
> favorable impacts … associated with reductions in accruals
> principally related to the wind-down of integration activities of
> previously acquired companies, operations originally structured as
> joint ventures and miscellaneous tax matters.

The Company falsely suggested that it had determined, that quarter, that $80 million of reserves

were no longer necessary and could appropriately be released in the first quarter of 2003:

> During the three months ended March 31, 2003, we reviewed the
> matters related to the wind-down and settlement of balances
> associated with the integration activities of previously acquired
> companies and operations originally structured as joint ventures
> and determined that based on decreases in transactional activity
> and magnitude of their net position that it was appropriate to
> reduce certain accruals….   These balances were considered to be
> in dispute, erroneous and/or for amounts which could not be
> resolved.

107.    Nortel's improperly-timed release of approximately $272 million in excess

reserves caused it to report in its First Quarter 2003 Earnings Release and its First Quarter 2003

Form 10-Q materially overstated net earnings for the quarter.  Specifically, at the time, absent the

improper and out-of-period release of approximately $272 million in excess reserves, Nortel

would have reported an approximate $218 million loss (or $0.05 US GAAP loss per share)

instead of a $54 million profit (or $0.01 US GAAP earnings per share) for the quarter.  (A

reserve is released "out-of-period" (and the release is improperly timed) if no event occurs within

an accounting period to justify its release.)

108.    Nortel's First Quarter 2003 Earnings Release and First Quarter 2003 Form 10-Q

misrepresented and/or omitted at least the following material facts, disclosure of which was

necessary to make the statements made not misleading:

(a)    The First Quarter 2003 10-Q falsely represented in Note 1 to the financial

statements and Item 2 (Management's Discussion and Analysis of Financial

Condition and Results of Operations) that Nortel's consolidated financial

statements for the first quarter of 2003 had been prepared in accordance with

US GAAP.  This statement was materially false and misleading because

Nortel had inappropriately released approximately $272 million in excess

reserves that did not satisfy US GAAP.

(b)    Nortel's profit for the quarter had actually been reverse engineered through

the improperly-timed release of approximately $272 million of excess

reserves.  The releases had been timed specifically to meet earnings and bonus

targets for the first quarter of 2003.

(c)    Nortel's margins improved because of the release of excess reserves.

(d)    Although Nortel acknowledged the release of $80 million in reserves – and a

resulting favorable impact on Nortel's earnings for the quarter – it did not

acknowledge that those reserves had been released out-of-period and were

part of a much larger pool of excess reserves (approximately $270 million worth) that had been released improperly in the first quarter of 2003.

(e)     Nortel continued to hold other excess reserves on its books and records which were not disclosed in the First Quarter 2003 Earnings Release or First Quarter 2003 Form 10-Q and were not released into their proper periods, but rather, were being maintained for future earnings management purposes.

109.    Nortel's Second Restatement, which includes adjustments for the improperly-timed first quarter reserve releases but also makes other adjustments for the first quarter, revealed that Nortel should have recorded at least a $124 million loss for the first quarter of 2003.

### b.    <u>Second Quarter 2003</u>

110.    Just as they had done for the first quarter of 2003, Nortel's corporate financial planning staff carried out the instructions of Nortel's top executives and created scenarios for achieving a US GAAP profit for the second quarter by releasing excess reserves.  Overall, Nortel intended to release approximately $514 million in reserves in the second quarter of 2003, approximately $370 million of which were specifically timed to meet earnings and bonus targets.  The plan, if fully executed, was expected to result in a *pro forma* profit of $186 million and a US GAAP profit of $131 million for the second quarter of 2003.  These results were not achieved, however, because, during the second quarter closing process, Nortel had to reverse $142 million in releases after it informed the outside auditor that it did not have the support to justify releasing those reserves into second quarter income.  As a result, Nortel reported a US GAAP loss for the second quarter of 2003; nevertheless, because it had improperly released other reserves during the second quarter, Nortel reached a *pro forma* profit, which it then used to pay more RTP bonuses.

111.    Specifically, in March 2003, based on communications with Nortel, the outside auditor learned that Nortel had released at least $80 million in excess reserves in the first quarter of 2003.  It asked Nortel to provide support for the timing of those releases.  By the end of April 2003, it was apparent that Nortel could not produce such support.

112.    When Nortel could not produce support to its outside auditor demonstrating into which periods the $80 million in excess reserves should appropriately have been released, the outside auditor expressed to management concern about the releases and cautioned management not to release any further reserves for which Nortel did not have appropriate support.  The outside auditor also informed Nortel's Audit Committee, on April 23, 2003, that Nortel's reserve levels and the impact of reserve releases on earnings would require the auditor's focus during the second quarter 2003 review and the year-end 2003 audit.  Additionally, on May 9, 2003, the outside auditor made a presentation to the Audit Committee in which it identified reserves and reserve releases as a "quality of earnings" issue, and recommended that (i) "[m]anagement should perform a rigorous review of all remaining balance sheet provisions and ensure that only appropriate required provisions are recorded" and (ii) "[r]eleases of provisions should only be recorded after appropriate review and requirements and documented rationale for releases."

113.    Management responded by undertaking a limited review of reserves released from Nortel's balance sheet during the second quarter of 2003.  In early July 2003, while Nortel was in the midst of its second quarter closing process, Nortel's Controller told the outside auditor that $142 million of the releases made that quarter were out-of-period.  Management knew of other improper releases made in the second quarter of 2003 but did not disclose those to the outside auditor.

114.    The $142 million in out-of-period releases identified to the auditor were reversed because Nortel could not provide any support justifying their release into second quarter income

and because their release would have materially affected Nortel's results by turning its second quarter 2003 loss into a profit. On or about July 7, 2003, the outside auditor asked Nortel to keep the $142 million on its books until appropriate support could be gathered and they could be released into the proper periods. The auditor determined that this was a reportable condition and, on July 24, 2003, it made a presentation to the Audit Committee in which it indicated that "[i]t is unclear, due to the lack of documentation at this time …, what the original rationale for recording certain provisions was and whether it would have been appropriate to reduce these in prior years." The outside auditor also informed the Audit Committee that "[m]anagement has a project underway to gather support and determine proper resolution of certain provision balances."

115.    Nortel's plan for achieving second quarter US GAAP profitability was thus thwarted. Nortel had released approximately $372 million of reserves (approximately $228 million of which were excess reserves released specifically to meet earnings and bonus targets) in the second quarter of 2003, but, it was unable to release sufficient excess reserves in that quarter to achieve US GAAP profitability.

116.    On July 24, 2003, Nortel issued an earnings release which made public its financial results for the second quarter of 2003 ("Second Quarter 2003 Earnings Release"). The release reported a US GAAP net loss for the second quarter of $14 million (or $0.00 earnings per share).

117.    On August 12, 2003, Nortel filed with the Commission its quarterly report on Form 10-Q for the period ending June 30, 2003 ("Second Quarter 2003 Form 10-Q"). Nortel's Form 10-Q reported a US GAAP net loss of $14 million (or $0.00 earnings per share) for the second quarter of 2003. In Note 3 to the financial statements ("Consolidated Financial Statement Details – Other") and Item 2 ("Management's Discussion and Analysis of Financial Condition

and Results of Operations"), Nortel made no mention of its improperly timed release of approximately $228 million in excess reserves, but rather, merely reiterated its prior incomplete disclosure about its first quarter release of the $80 million in reserves. It stated:

> [d]uring the three months ended March 31, 2003 and six months ended June 30, 2003, Nortel Networks net earnings (loss) included approximately $80 [million] of favorable impacts … associated with reductions in accruals principally related to the wind-down of integration activities of previously acquired companies, operations originally structured as joint ventures and miscellaneous tax matters.

118.    Nortel's improperly-timed release of approximately $228 million in excess reserves caused it to report in its Second Quarter 2003 Earnings Release and its Second Quarter 2003 Form 10-Q materially understated net losses for the quarter. Specifically, at the time, absent the release of approximately $228 million in excess out-of-period reserves, Nortel would have reported an approximate $242 million loss (or $0.05 US GAAP loss per share) for the quarter instead of a $14 million loss (or $0.00 US GAAP earnings per share).

119.    Nortel's Second Quarter 2003 Earnings Release and Second Quarter 2003 Form 10-Q misrepresented and/or omitted at least the following material facts, disclosure of which was necessary to make the statements made not misleading:

> (a)    The Second Quarter 2003 Form 10-Q falsely represented in Note 1 to the financial statements and Item 2 (Management's Discussion and Analysis of Financial Condition and Results of Operations) that Nortel's consolidated financial statements for the second quarter of 2003 had been prepared in accordance with US GAAP. This statement was materially false and misleading because Nortel had inappropriately released approximately $228 million in excess reserves that did not satisfy US GAAP.

(b)     Nortel's second quarter results had been reverse-engineered through the improperly-timed release of approximately $228 million of excess reserves. The release of those reserves had been specifically timed to meet earnings and bonus targets for the quarter.

(c)     Nortel continued to hold excess reserves on its books and records which were not disclosed in the Second Quarter 2003 Earnings Release or Second Quarter 2003 Form 10-Q and were not released into their proper periods, but rather, were maintained on Nortel's books and records.

(d)     The $80 million in reserves were released in – and had a favorable impact on Nortel's earnings for – the first quarter of 2003. Such releases were out-of-period and represented a fraction of total out-of-period releases made by Nortel in the first and second quarter of 2003.

120.    Nortel's Second Restatement, which includes adjustments for the improperly-timed second quarter reserve releases but also makes other adjustments for the second quarter, revealed that Nortel should have reported at least a $101 million loss for the second quarter of 2003.

121.    The earnings and loss figures that were misstated in the First and Second Quarter 2003 Forms 10-Q affected future public filings which incorporated those figures by reference, including, but not limited to:  (i) Nortel's Forms 10-Q and 10-Q/A for the period ending June 30, 2003 and September 30, 2003 ("Second Quarter 2003 Form 10-Q," "Amended Second Quarter 2003 Form 10-Q," "Third Quarter 2003 Form 10-Q" and "Amended Third Quarter 2003 Form 10-Q") and (ii) all of Nortel's Forms S-3, S-4 and S-8 filed with the Commission from June 30, 2003 through August 5, 2003.  The earnings and loss figures that were misstated in the First and

Second Quarter 2003 Forms 10-Q were restated on November 19, 2003 and December 23, 2003 as part of the First Restatement, and on January 11, 2005 as part of the Second Restatement.

> **3.    *Nortel Rewards Its Executives And Others***
> ***With Undeserved Bonuses On The Basis Of***
> ***Results Achieved Through Its Fraudulent Scheme***

122.    Nortel's employees, and particularly its then top executives, received millions of dollars in bonuses as a result of Nortel's earnings scheme in 2002 and 2003.  The scheme artificially created the *pro forma* profit levels necessary to trigger bonuses.

123.    Nortel specifically took RTP bonus payments into account when deciding the amount of excess reserves to release in the first and second quarters of 2003.  Specifically, reserve releases were tracked and releases were made in amounts sufficient not only to generate a profit in those quarters, but also, to pay RTP bonuses.

124.    In 2003, approximately $92 million was paid in RTP bonuses.  Of that amount, approximately $19 million went to 43 top executives, including Dunn, Beatty and Gollogly, and the remainder was spread out over a 30,000-person workforce.  Approximately $10 million was paid in the second quarter of 2003 alone because, although Nortel had not posted a US GAAP profit that quarter, it nonetheless had achieved a $34 million *pro forma* profit, thereby triggering payment of RTP bonuses.

125.    The reserve releases in the first and second quarters of 2003 also enabled Nortel to artificially meet the criteria for issuing so-called "Restricted Stock Units" ("RSUs") to management.  Forty-three top executives received 6.26 million RSUs in July 2003, and thirty-seven collected an additional 5.6 million RSUs in January 2004.  Similar to the pursuit of RTP bonuses, reserve releases were tracked and releases were made in amounts sufficient to ensure the Company met RSU performance milestones.  Indeed, Nortel's corporate financial planners

continually analyzed the effect that planned reserve releases would have on management's ability to receive RSUs.

126.       These same releases also allowed Nortel's management to claim that they had met the criteria for receiving so-called "SUCCESS" bonuses.  In January 2004, approximately $8.2 million was awarded to 24 of Nortel's top executives in the form of a SUCCESS bonus, but Nortel deferred awarding a SUCCESS bonus to Dunn and Beatty, who ultimately were terminated and did not receive a SUCCESS bonus.

### 4.       Fraudulent Statements Made About The Circumstances Behind The First Restatement

127.       Nortel's earnings management scheme began to unravel at the end of the second quarter of 2003.  On the morning of July 24, 2003, the same day on which Nortel issued its Second Quarter 2003 Earnings Release, Nortel's outside auditor informed Nortel's Audit Committee that it had found a "reportable condition" with respect to weaknesses in Nortel's accounting for the establishment and disposition of reserves.

128.       The auditor informed Nortel's Audit Committee that, in response to its concerns, Nortel's management had undertaken a project "to gather support and determine proper resolution of certain provision balances."  Management, in fact, had undertaken this project because the auditor required adequate audit evidence for their upcoming year-end 2003 audit.

129.       Nortel concealed its auditor's concerns from the public.  Nortel's Second Quarter 2003 Earnings Release contained no mention of auditor's concerns and merely stated that:

> Given in 2003 relatively minor amounts may have greater effect on reported results, the Company has initiated a comprehensive review and analysis of its assets and liabilities.  The outcome of the activity may result in the elimination of certain assets and liabilities but is not expected to have a negative impact to net assets.  No amounts relating to the elimination of any such assets and liabilities have been included in the results for the second quarter of 2003.

During the earnings call that same day ("Second Quarter 2003 Earnings Call"), Nortel's CFO

explained that Nortel was undertaking a "comprehensive review of assets and liabilities" because

Nortel's improved operating results had "introduced the company to a new environment, where

relatively minor amounts, both expense and income, have a much greater opportunity to

[materially] impact reported results each quarter."  He went on to say that "minor amounts

included in results prior to 2003 would not have been considered material, but those same

amounts today could have the effect of changing reported results in a quarter from a profit to a

loss or vice versa."

    130.      Nortel's disclosures about its review of assets and liabilities in 2003 were

materially false and misleading because such disclosures failed to state that the review had been

prompted by the outside auditor's report to the Audit Committee and that the outside auditor had

expressed concern about Nortel's creation and use of reserves and the quality of its earnings.

Additionally, the disclosures omitted any mention of Nortel's fraudulent manipulation of reserve

accounts to manage earnings.

    131.      On August 12, 2003, in its Second Quarter 2003 Form 10-Q, Nortel disclosed for

the first time that its outside auditor had raised a "reportable condition," but it omitted any

mention of the nature of the concern or that the Company had engaged in improper accounting

practices with respect to its reserves.  Instead, Nortel merely reiterated what it had told the public

in the past:

> In light of a period of unprecedented industry adjustment and
> subsequent restructuring actions, including workforce reductions
> and asset write-downs, in the second quarter of 2003 Nortel
> Networks initiated a comprehensive review and analysis of
> identifiable categories of its assets and liabilities (the
> "comprehensive review"). The amounts under review were
> recorded when Nortel Networks balance sheet and income
> statement were much larger. Specifically, what would have been
> relatively minor amounts in prior periods may be considered to be

> material to current periods. The comprehensive review is in
> addition to reviews normally performed by Nortel Networks in
> connection with the recording of current period financial results.

Such disclosures created the materially false and misleading impression that the review

concerned activities pre-dating the restructuring, when "Nortel['s] … balance sheet and income

statement were much larger." Nortel knew such disclosures were materially false and misleading

because, the review, in fact, concerned activities that impacted the Company's 2002 and 2003

financials, as well as financials from earlier periods. No mention was made of the auditor's

concern about Nortel's creation and use of reserves, except for a cryptic statement that:

> In connection with the assessment of the liabilities (including
> accruals and provisions) identified above, Nortel Networks has
> noted certain deficiencies in documentary support. Nortel
> Networks continues to address this matter as part of the
> comprehensive review.

Such a disclosure failed to reveal the elaborate earnings management scheme in which Nortel

had engaged.

132.    Just prior to the filing of Nortel's Second Quarter 2003 Form 10-Q, Nortel's

Controller sent a candid email to employees assisting him in the First Restatement which warned

that Nortel's comprehensive review would put an end to the Company's historical practice of

using reserves to manage earnings. On July 31, 2003, he wrote, "I think we need to reinforce the

importance of forecasting. It's [sic] seems like a throwaway comment, but if we "clean up" the

balance sheet, the [business units'] ability to deliver earnings based partly on discretionary

elements pretty much goes away."

133.    Nortel's CEO and CFO nevertheless continued to trumpet Nortel's supposed

return to profitability. On October 23, 2003, during Nortel's third quarter 2003 earnings call,

Nortel's CEO said "we will make not only [a] profit in the [third] quarter, but a profit on the full

year, and that's the first time in six years." Likewise, during Nortel's fourth quarter 2003

earnings call, he said "our revenues came in at $9.8 billion and our earnings for the full year came in at $372 million, which is really the first profit we have had on a full-year basis. The last time we made profits was six years ago." Nortel's statements were materially false and misleading because its first and second quarter 2003 results – and thus its results for 2003 – had been artificially boosted by improper reserve releases.

134.    At the same time, Nortel also misrepresented the reasons behind its need to restate its prior financial results. On October 23, 2003, Nortel announced in a press release that it would need to make a financial restatement. During Nortel's third quarter 2003 earnings call, also held on October 23, 2003, Nortel misleadingly characterized the restatement as an effort to clean up honest control lapses in prior years. Nortel's CFO innocuously explained that "following a period of dramatic restructuring" the Company found some "mistakes" in its accounting. Nortel's CFO repeated that theme and also pointed out that Nortel decided to review its assets and liabilities because the "impact of materiality" had recently changed as Nortel's results were "picking around along break-even." Nortel's CEO likewise stated in a press release issued the same day that "[t]he challenges that faced Nortel Networks and our industry over the past few years were unprecedented … It is clear now that in such a volatile environment, errors were made." At no time did Nortel give any indication that intentionally improper accounting was to blame.

135.    Shortly after Nortel announced on October 23, 2003 that it needed to restate its financial statements, Nortel's Audit Committee commenced an independent investigation and hired outside counsel to help the Audit Committee "gain a full understanding of the events that caused significant excess liabilities to be maintained on the balance sheet that needed to be restated," as well as to recommend any necessary remedial measures.

136.    On November 19, 2003, while the Audit Committee's investigation was still ongoing, Nortel filed its First Restatement in its quarterly report on Form 10-Q for the period ending September 30, 2003 ("Third Quarter 2003 Form 10-Q"), which restated approximately $948 million in total liabilities. The First Restatement offered the same explanations that had been provided earlier by management and likewise gave no indication that any misconduct led to the restatement. Moreover, due to the restricted nature of the management-led review and its focus only on certain reserve issues, the First Restatement did not restate any revenues that had been affected by the revenue recognition scheme and it did not restate for a significant number of the improper reserve set-ups and releases that had been made as part of the earnings management scheme.

137.    Nortel's fraud finally crumbled in early 2004 when Nortel's Audit Committee began to see evidence of the improper establishment and use of additional reserves, beyond what had led to the First Restatement. Over the next two months, Nortel concluded that it needed to restate its results for a second time. The Company also terminated its then CEO, CFO and Controller and several other senior finance managers.

138.    On January 11, 2005, Nortel issued a "Second Restatement," which restated Nortel's liabilities by at least another $746 million and restated revenues by approximately $3.4 billion. The financial statement effects of Nortel's two accounting fraud schemes were restated as of this date, although unresolved material weaknesses in Nortel's internal controls remained. Nortel also disclosed the findings to date of the Audit Committee's independent review, which concluded, among other things, that Dunn, Beatty and Gollogly were responsible for Nortel's improper use of reserves in the second half of 2002 and first half of 2003.

139.    In May 2006, in its Form 10-K for the period ending December 31, 2005 ("2005 Form 10-K), Nortel disclosed that its restated revenues in part had resulted from management

fraud, stating that "in an effort to meet internal and external targets, the senior corporate finance management team … changed the accounting policies of the Company several times during 2000," and that those changes were "driven by the need to close revenue and earnings gaps."

## NNL'S FRAUDULENT FILINGS

140.    At all times relevant to this Complaint, NNL was Nortel's principal operating subsidiary and it shared the same management slate with Nortel, including the persons who held the positions of CEO, CFO, Controller and Assistant Controller.  NNL's financial results – which were consolidated into Nortel's publicly reported financial statements – constituted almost the entirety of Nortel's financial results.  The improper revenue and reserve manipulations alleged in this Complaint were largely made in NNL's books and records, reflected in NNL's financial statements and consolidated into Nortel's publicly reported financial results.

141.    Not only were NNL's financial results consolidated into Nortel's financial statements and reported on a consolidated basis in Nortel's periodic filings with the Commission, but also, NNL filed periodic reports with the Commission on its own behalf which contained materially false and misleading NNL financial statements and disclosures.  The financial results of Nortel and NNL were misstated by similar amounts.  NNL's disclosures, which mirrored Nortel's disclosures in all material respects, were false and misleading to the same extent as the disclosures in Nortel's periodic filings.

142.    On March 13, 2001, NNL filed with the Commission its annual report on Form 10-K for the period ending December 31, 2000 ("NNL's 2000 Form 10-K").  NNL's reported fourth quarter and year-end 2000 revenues were materially overstated and its related disclosures were materially false and misleading because NNL – led by its (and Nortel's) then CFO, Controller and Assistant Controller – had prematurely recognized revenues on improper bill and hold transactions for the fourth quarter of 2000.

143.     On March 10, 2003, NNL filed with the Commission its annual report on Form 10-K for the period ending December 31, 2002 ("NNL's 2002 Form 10-K").  NNL's 2002 Form 10-K reported NNL's fourth quarter 2002 loss in the "Quarterly Financial Data (Unaudited)" section.  NNL's reported loss and related disclosures were materially false and misleading because NNL – led by its (and Nortel's) then CEO, CFO and Controller – had improperly booked unnecessary reserves for the fourth quarter of 2002 to reduce its earnings.

144.     On May 9, 2003, NNL filed with the Commission its quarterly report on Form 10-Q for the period ending March 31, 2003 ("NNL's First Quarter 2003 Form 10-Q").  Its earnings for the period were materially overstated and its related disclosures were materially false and misleading because NNL – led by its (and Nortel's) then CEO, CFO and Controller – had made improper and out-of-period releases of excess reserves.

145.     On August 12, 2003, NNL filed with the Commission its quarterly report on Form 10-Q for the period ending June 30, 2003 ("Second Quarter 2003 Form 10-Q").  Its earnings for the period were materially overstated and its related disclosures were materially false and misleading because NNL – led by its (and Nortel's) then CEO, CFO and Controller – had made improper and out-of-period releases of excess reserves.

146.     The revenue figures that were misstated in NNL's 2000 Form 10-K and the earnings/loss figures that were misstated in NNL's 2002 Form 10-K and its First Quarter 2003 Forms 10-Q affected future NNL public filings which incorporated those figures by reference, including, but not limited to: (i) NNL's Forms 10-Q for the periods ended March 31, 2001 and June 30, 2001 and its Forms 10-Q and 10-Q/A for the period ended September 30, 2001, (ii) NNL's Form 10-K for the period ended December 31, 2001, (iii) NNL's Forms 10-Q for the periods ended March 31, 2002, June 30, 2002 and September 30, 2002, (iv) NNL's Form 10-K and 10-K/A for the period ended December 31, 2002 ("2002 Form 10-K"), (v) NNL's Forms

10-Q and 10-Q/A for the periods ended March 31, 2003, June 30, 2003 and September 30, 2003 and (vi) all of NNL's Forms S-3 and S-3/A filed with the Commission from November 7, 2001 through May 30, 2002.

147.     On November 19, 2003, NNL filed its quarterly report on Form 10-Q for the period ending September 30, 2003, in which it restated certain liabilities relating to its improper and out-of-period releases of excess reserves ("NNL's First Restatement").  In December 2003, NNL amended its 2002 Form 10-K and its Forms 10-Q for the first and second quarters of 2003. Such filings, like Nortel's First Restatement filings, were materially false and misleading because they did not restate any revenues that had been affected by the revenue recognition scheme and did not restate for a significant number of the improper reserve set-ups and releases that had been made as part of the earnings management scheme.

148.     On January 18, 2005, just as Nortel had done on January 11, 2005, NNL filed its annual report on Form 10-K for the period ending December 31, 2003, and restated certain revenues and liabilities for fiscal years 2001, 2002 and the first, second and third quarters of 2003 ("NNL's Second Restatement").  The financial statement effects of NNL's revenue recognition and earnings management schemes were corrected as of this date, although unresolved material weaknesses in NNL's internal controls remained.

## FIRST CLAIM
### Violations of Securities Act Section 17(a)

149.     The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 148 above.

150.     Nortel and NNL, directly or indirectly, knowingly, recklessly or negligently, in the offer or sale of their securities, by use of the means or instruments of transportation or communication in interstate commerce, or by use of the mails:  (a) employed devices, schemes

or artifice to defraud; (b) obtained money or property by means of untrue statement of material fact or omitted to state a material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, practices or courses of business which operated or would have operated as a fraud or deceit upon purchasers of Nortel securities.

151.    By engaging in the conduct alleged above, Nortel and NNL violated Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

### SECOND CLAIM
**Violations of Exchange Act Section 10(b)
and Exchange Act Rule 10b-5 Thereunder**

152.    The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 151 above.

153.    Nortel and NNL, directly or indirectly, by use of the means or instruments of interstate commerce, or of the mails, or of a facility of a national securities exchange, knowingly or recklessly:  (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary to make statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit on any person, in connection with the purchase or sale of securities.

154.    By engaging in the conduct alleged above, Nortel and NNL violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

### THIRD CLAIM
**Violations of Exchange Act Section 13(b)(5)**

155.    The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 154 above.

156.      Nortel and NNL knowingly circumvented or knowingly failed to implement a system of internal accounting controls or knowingly falsified books, records or accounts subject to Exchange Act Section 13(b)(2).

157.      Nortel and NNL directly or indirectly, falsified or caused to be falsified books, records or accounts subject to Exchange Act Section 13(b)(2).

158.      By engaging in the conduct alleged above, Nortel and NNL violated Exchange Action Section 13(b)(5) [15 U.S.C. § 78m(b)(5)].

### FOURTH CLAIM
### Violations of Exchange Act Section 13(a)
### and Exchange Act Rules 12b-20, 13a-1 and 13a-13 Thereunder

159.      The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 158 above.

160.      Exchange Act Section 13(a), and Rules 13a-1 and 13a-13 thereunder, require issuers of registered securities to file with the Commission factually accurate annual and quarterly reports.  Exchange Act Rule 12b-20 further provides that, in addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they were made, not misleading.

161.      By engaging in the conduct alleged above, Nortel and NNL violated Exchange Act Section 13(a) [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13].

### FIFTH CLAIM
### Violations of Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B)

162.      The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 161 above.

163.     Exchange Act Section 13(b)(2)(A) requires issuers to make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the issuer's assets.  Exchange Act Section 13(b)(2)(B) requires issuers to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that, among other things, transactions are recorded as necessary to permit the preparation of financial statements in conformity with US GAAP and to maintain accountability for the issuer's assets.

164.     Nortel and NNL violated Section 13(b)(2)(A) during fiscal years 2000 through 2005 as alleged above and as further demonstrated by Nortel's and NNL's three restatements, running into billions of dollars.  Likewise, by having insufficient internal controls to prevent the recording of erroneous, misleading and outright fraudulent entries, Nortel and NNL did not prepare their financial statements in accordance with US GAAP, and thus violated Section 13(b)(2)(B).  Nortel and NNL have admitted in their public filings to "material weaknesses in [its] internal controls over financial reporting."  Those control failures include:

- insufficient controls around the application of its internal accounting guidelines;

- insufficient controls around manual journal entries which allowed finance personnel to record entries in Nortel's general ledger without supporting documentation;

- insufficient controls over the preparation and review of post-closing adjustments;

- a lack of emphasis on the account reconciliation process;

- insufficient authority on the part of Nortel's accounting compliance organization to resolve accounting issues and insist upon accounting practices that conformed to US GAAP;

- the failure of Nortel's technical accounting function to proactively review contracts to establish an appropriate revenue recognition method;

- inconsistent application of revenue recognition methods across the Company;

- the failure of Nortel's internal audit function to provide an independent check on the integrity of Nortel's financial reporting to determine whether Nortel's accounting policies were in compliance with US GAAP, and to evaluate whether these policies were properly applied; and

- the lingering existence of multiple accounting systems which require thousands of manual journal entries to the general ledger system each quarter.

147.     By engaging in the conduct alleged above, Nortel and NNL violated Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B) [15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(2)(B)].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court:

(a)     permanently restrain and enjoin Nortel and NNL from violating Securities Act Section 17(a), Exchange Act Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B) and 13(b)(5) and Exchange Act Rules 10b-5, 12b-20, 13a-1 and 13a-13;

(b)     order Nortel and NNL to pay disgorgement, with prejudgment interest;

(c)     pursuant to Securities Act Section 20(d) and Exchange Act Section 21(d)(3), order Nortel and NNL to pay civil penalties;

(e)     grant any equitable relief that may be appropriate or necessary for the benefit of investors pursuant to Exchange Act Section 21(d)(5); and

(f)     grant such other relief as the Court may deem just and appropriate.

Dated: October 15, 2007
       Washington, DC                          Respectfully submitted,


                                        _/s/ Suzanne J. Romajas_____
                                        Suzanne J. Romajas (SR-4531)
                                        Lead Attorney To Be Noticed
                                        -and-
                                        Christopher R. Conte
                                        Timothy N. England
                                        Margaret S. McGuire
                                        Vincente L. Martinez

                                        Securities and Exchange Commission
                                        100 F Street, NE
                                        Washington, DC 20549-4030
                                        Tel: 202-551-4473 (Romajas)
                                        Fax: 202-772-9245 (Romajas)
                                        Email: RomajasS@sec.gov

                                        Counsel for Plaintiff